**VACANTE v. UNITED STATES et al.**

District Court, S. D. New York.

Jan. 7, 1947.

William Fried, of New York City (Jaquin Frank, of New York City, of counsel), for libelant.

John F. X. McGohey, U. S. Atty., and Kirlin, Campbell, Hickox & Keating, all of New York City (Vernon S. Jones, of New York City, of counsel), for respondent United States.

Purdy & Lamb, of New York City (Edward F. Lamb and Thomas J. Irving, both of New York City, of counsel), for Marra Bros., Inc.

KNOX, District Judge.

Libelant, a stevedore employed by Marra Bros., Inc., here seeks damages against the owner of the steamship Peter Zenger, for personal injuries which he says were occasioned by the breaking of a rung of a ladder, which extended from the vessel's lower hold to her 'tween deck at the after end of No. 2 hatch. The faults alleged against respondent are negligence and unseaworthiness. After suit was begun, the United States impleaded Marra Bros., Inc.

The accident occurred on November 7, 1945. Some ten days prior thereto, Marra Bros. Inc. had begun to load the ship with cargo, most of which consisted of structural steel beams of various dimensions. A number of them were forty feet in length.

Libelant was a member of a gang of eight longshoremen, whose work consisted largely of stowing cargo that was lowered into the hold by the ship's tackle. On the day of his injury, and shortly before its occurrence, libelant and his fellow workmen, had been so engaged.

On the vessel's deck there had been a group of five men who lowered drafts of cargo into the lower hold of hatch No. 2. This group consisted of a foreman (Ragonese), two winchmen, one of whom was libelant's father (Francesco Vacante), a gangway man (Lanza), and a relief man whose name was not revealed at the trial. With the exception of libelant, these men had long worked together, and were experienced stevedores. Libelant, although he had previously worked as a stevedore, had been with his associates on the Peter Zenger, for a period of but four or five weeks.

No. 2 hatchway was thirty-six feet in length and twenty feet wide. Due to the length of some of the girders, they were lowered into the hold more or less perpendicularly. When raised from the barge that lay alongside the ship, the load would be swung over the square of the hatch, and there brought to a stop. At a signal of the gangway man, the draft would be lowered away into the lower hold. The eight men who stowed the cargo were divided into two groups of four each, one being the off-shore, and the other, the inshore, gang. These gangs alternated in receiving and stowing the freight. At the time of the accident,

---

[5] Lambert Pharmacal Co. v. Bolton Chemical Corp., D.C., 219 F. 325. 326.

the height of the steel in the lower hold of No. 2 hatch, consisting of girders and plates, was about four feet. At and about the bottom of the after ladder, there was an open space of approximately four feet square.

At about 10:30 a. m., on November 7, 1945, the lighter from which the steel had been taken was empty, and No. 2 hold was not to be worked further that day. Thereupon, Ragonese—wishing to take advantage of the then position of the ship's booms for the purpose of placing one or more strong-backs across the hatchway, called libelant and one of his companions to come on deck to assist in the operation.

Libelant was the first man to start to climb the after ladder. This was due, presumably, to the fact that his companion had forgotten his gloves and went back to get them. Vacante climbed the ladder in the normal manner, hand over hand (its heavy steel rungs being about one foot apart), until he approached the one at the top which was on a level with the 'tween deck. According to the versions of what then took place, as given by libellant and Ragonese, Vacante put both his hands on the ladder's top rung. His feet, and consequently his weight, rested on a rung some four feet below. So positioned, he prepared to grasp a rung of the ladder that extended from the 'tween deck to main deck. As he made this effort, the top rung of the lower ladder broke away from its uprights, causing libelant to fall to the lower hold of No. 2 hatch, a distance of about twenty-five feet. As can well be imagined, libelant suffered severe injuries, and if the accident came about in the manner that libelant and his witnesses assert, he is entitled to a substantial recovery. Unhappily for him, however, the facts as stated by libelant and his witnesses, are vigorously denied by the respondents.

According to Cain, the chief mate of the Peter Zenger, the facts are as follows: At the time of the accident, he was sitting in his room on the starboard side of the boat deck, from which he had a view of the whole forward part of the ship. His first knowledge of Vacante's misadventure was when Cochran, the vessel's first assistant engineer, called out and said: "Charlie, you better get out there—there has been an accident." Cain immediately went to No. 2 hatch and looked into the hold. He there saw the longshoremen placing Vacante on a "pie plate," enclosed within a net, for the purpose of lifting him to the deck. Cain inquired of Cochran as to what had "happened to the guy," and was told that Newman, a watchman employed on the vessel, had said that Vacante had fallen into the hold. Thereupon, Cain called to Cochran and Newman and asked them to "Take a good look at these ladders, take a good look at everything here, all the ship's gear. You see anything wrong with it?" Looking at both the forward and after ladders, Cain, Cochran and Newman agreed that all these appliances were intact, and that no rungs were missing from either of the ladders.

As Vacante's body was raised to a point about even with the boat deck, some one said, "Get a basket to get him on shore," and Cain started to the hospital to comply with this request. Procuring the basket, he handed it to a longshoreman and then said to the purser whom he had found in the hospital, "Get out there on deck and get some signed statements about the nature of this accident. Get Mr. Ganney, the third mate. I want to get this thing in right, get some signatures." This was never done. Cain then started to follow the longshoreman to whom he had given the basket. As he did so, another longshoreman addressed him and said, "Hogan wants to see you— the head of the dock." Hogan, it appears, was the representative of Marra Bros., Inc., and had general supervision of the work of the stevedores. Some question seems previously to have arisen as to whether a quantity of garbage that had accumulated on the ship would be removed by the sailors at a time that would not interfere with the loading of the vessel, and because of this Hogan wished to see Cain. Going onto the dock, an unknown person volunteered to take Cain to Hogan. For some reason, Cain's escort could not find Hogan and, after leading Cain for 500 or more feet over the dock, he made inquiry of a guard as to where Hogan could be found. The guard said "He is over in his office" and there Hogan finally was found.

On entering the office, Hogan spoke to Cain and said: "What happened there?" Cain replied, "A guy fell in the hold." At this, a man came into the room and said, "There is a rung off that ladder." Cain exclaimed, "You're nuts. There is no rung off that ladder." Cain then left Hogan's office and went to look at Vacante who was then lying on the dock awaiting the arrival of an ambulance. Returning to the ship, Cain saw Ganney, the third mate, and asked, "Have you been here at that hatch?" Receiving an affirmative reply, Cain added, "Some bozo said there is rungs gone off that ladder." Ganney said: "They ain't kidding; there is two rungs off that ladder." At this point, it should be noted that Ragonese, in giving his testimony, stated that he had often gone up and down the after ladder in No. 2 hatch and had never observed that any of its rungs was missing, and that aside from the one that gave way when Vacante grasped it, the ladder was intact. Battiloro, however, the head foreman for Marra Bros., Inc., said that the fourth rung from the bottom was missing when the ship first arrived at the pier where she was loaded. Other stevedores testified to the same effect.

On being told that two rungs were missing, Cain said to Ganney, "Come along, let us go look at it." Going to the hatchway, they saw that the top rung of the after lower hold ladder was missing, as was the fourth one from the bottom. Descending into the hold, Cain and Ganney started to look for the missing rungs but were unable to find them. But, as they continued the search, Fisicaro, a longshoreman, handed a rung to Ganney who gave it to Cain. This rung turned out to be the one at the top of the after ladder in No. 2 hatchway. The other rung was never found.

A description of the ladder's top rung, and which was introduced in evidence at the trial, now becomes important. This can best be done by summarizing the testimony of Captain Lynner who, on behalf of respondent, surveyed the after ladder in No. 2 hatchway on the day following the accident. The rung was of steel, had an up and down length, of about one inch, and a breadth of one-half inch. At each of its ends, it had been welded to the

ladder's uprights. Each end showed an old and a new break. "The old break was corroded and the new break was absolutely bright, so the new break must have been caused within a day or two or three, provided that there was not any rain getting on to the breaks. There had not been any rain. The old and the new breaks were about 50% each, the total area of the welding. The old break contained about half of it, and the new break half of it. It was exactly alike on both ends. You had old-break corrosions on the old metal on both ends, and it was new on both ends too, and the new was on the face side of the rung." In Lynner's opinion, "the metal that was broken there in the new break, would necessarily hold more than any ordinary man, and would easily hold a weight of four to five hundred pounds. A force greater than that would be required to detach it from the fresh weld."

Curiously enough, the uprights of the ladder, at the point where the lower rung was missing, also disclosed an old and a new break in the welding.

From my inspection of the ladder's top rung, I am in agreement with Captain Lynner with regard to its weight-bearing capacity prior to the time that the new break occurred. It is possible, of course, as Cain said, that the drafts of cargo were negligently handled, and if so, one of them may have struck the ladder and cracked the welding without displacing the rung. There is, however, no proof on which a finding to this effect can be made. For this reason, I am confronted with the necessity of making a choice between the stories that were told by libelant and Ragonese on one side, and those of Cain, Cochran and Newman on the other.

Cain did not make an impressive witness. He was too verbose and was neglectful of his responsibility to his ship in allowing himself, at a critical moment, to be diverted from giving full attention to what had occasioned the accident. Cochran and Newman, however, appeared to be wholly trustworthy. Cochran left the ship on February 13, 1946, and at the time of trial, was living on his brother's farm in Tennessee. There seems, therefore, no good reason why he should testify falsely as to

what he saw immediately following Vacante's fall. He had gone to No. 2 hatchway at the time that libelant was being placed on the "pie plate," and as already stated, it was he who called Cain to the scene. He also corroborated Cain with respect to the latter's admonition to take note of the condition of the ship's. gear, as well as that of the ladders. At the trial, Cochran testified, "We examined with our eyes. Everything was intact * * *. That rung was there, yes. We started at the bottom and looked up, I did. I * * * looked at every rung and every rung was in place."

As Vacante was carried off the ship, Cochran watched the operation. Thirty minutes or an hour later, Cain called him to replace a bolt that was missing on one side of the after ladder near the top, and located within four inches of the rung that was there missing. He could not say as to whether the bolt had been freshly removed. He did observe that at the points where the rungs were missing, "They had an old break in them and I will say 50% of it was bright, freshly broken off. That was true on both ends."

Newman's testimony, in substance, was similar to that of Cochran. He added, nevertheless, that he had seen the longshoremen go down the after ladder at 8 o'clock in the morning, and that, after the accident, they made use of it in coming out of the hold. At that time, he said the rungs were absolutely in place.

In the light of the positive and definite statements of both Cochran and Newman, I must hold that Vacante's injuries are not attributable to a defective rung in the after ladder in No. 2 hatchway.

How, then, did libelant come to fall? The answer, I believe, is to be found in his own testimony, and in that of his father. According to the latter, libelant had nervous spells at the age of eight or nine years. Occasionally he would faint. As a boy and as a young man, he had headaches "every once in a while, maybe every ten days, maybe every fifteen days, and these would last for hours." He was also subject to dizzy spells, and these would last from two to four hours. However, so far as the father knew, libelant had had none of these attacks since he was eighteen years old.

The younger Vacante is now thirty-one years old. He first worked as a longshoreman—was with the Bull line—about ten years ago. For a year and a half before entering the Army, on April 4, 1945, he worked at an ammunition dump in Bayonne, N. J. He says that as a youth he got nervous and excited, and was scared of things. In order to overcome these afflictions, he joined a unit of the National Guard of New York. This effort was not successful, and he finally stopped attending drills, and was given a dishonorable discharge. At about nineteen or twenty years "he would get scared or something and go into a fit and just drop on the floor and pass out." His last such experience before entering the Army was in 1944, while working on a sugar ship on a very hot summer day. He was laid out for about a half hour. He remained away from work for a day or two and then returned to work. He had, it would appear, a similar attack in 1939. While in the Army, some time between April 4 and August 26, 1945 (the date of his discharge) he spent most of his time in the hospital, undergoing medical treatment. During that period, and in the course of receiving a hot water treatment for hemorrhoids, he again passed out. He also fainted once or twice on the drill ground. His Army career had an early end, and this was because of his inability to adjust himself to the life of a soldier.

On being asked if he ever got dizzy on looking into the hold of a ship, he said, "Sometimes." He also felt nervous in starting down a ladder. He then went on to say: "Sometimes when I felt like I didn't go down; I would just wait on deck for a few minutes and then I started to go down. Most of the time I used an enclosed ladder underneath the mast where there is no opening, where there is a double bannister, and you can go down that way." Between libelant's discharge from the Army and the day of his accident, he was subjected to headaches, but had no dizzy spells.

On Vacante's cross-examination, the following testimony was given:

"Now, Mr. Vacante, that morning of the day of your accident when you went down the ladder, did you go down the ladder that was in the mast house against the bulkhead? Yes, sir."

"I think you told us you always did that if you could. Yes."

"That was because you were afraid that you might have a fainting spell if you did not, is that so? Yes."

"And you did it on the morning of November 7, 1945 because you thought then that you might have a fainting spell? Yes, sir."

From all this, it is apparent that Vacante should not have engaged in work which required him to ascend and descend ladders in open hatchways. His nervous instability and mental make-up were such that it is well within the range of reasonable possibility that he had an attack of vertigo or some similar ailment on the day of the accident (although he says that such was not the fact), and that this caused him to lose his balance and fall. But, be this as it may, he has not satisfactorily established that his injury was due to fault upon the part of respondents.

Having reached this conclusion, it is unnecessary to discuss the defensive matters of a legal nature that were brought to my attention at the time of trial.

Vacante's libel will stand dismissed.